NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 34

No. 2018-147

| | |
|---|---|
| Douglas S. Johnston | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windsor Unit, |
| | Family Division |
| | |
| Lorrie Johnston | December Term, 2018 |

Elizabeth D. Mann, J.

Melvin Fink, Ludlow, for Plaintiff-Appellant.

Emily S. Davis and Boolie Sluka (On the Brief) of Davis Steadman Ford & Mace, LLC,
  White River Junction, for Defendant-Appellee.

PRESENT: Reiber, C.J., Skoglund and Robinson, JJ., and Teachout, Supr. J. and Howard,
         Supr. J. (Ret.), Specially Assigned

¶ 1.    **SKOGLUND, J.**   This case asks us to examine that strange procedural device, the Qualified Domestic Relations Order (QDRO), and how it intersects with the statute of limitations for actions on judgments. The parties divorced in November 2004. As part of the divorce, the court ordered wife to transfer funds from her retirement account to husband. In 2006, the court approved a proposed QDRO to effectuate the transfer of said funds. The order was never "qualified," however, because there was no money in the retirement account that wife identified. The court approved another proposed QDRO in February 2007 specifying a different retirement account identified by wife. In August 2017, husband filed a motion to enforce, asserting that the owed funds were never transferred to him and that there were no funds in the second retirement

account that wife identified. The court denied husband's motion to enforce, finding it barred by the eight-year statute of limitations for actions on judgments. As set forth below, we do not consider husband's attempt to effectuate a transfer of these retirement funds by QDRO to be an action on a judgment, and we therefore reverse and remand.

¶ 2.     We begin with an overview of the relevant law governing the division of retirement accounts. A court must engage in a two-step process to divide retirement accounts governed by the federal Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461. It first "enters a substantive order which equitably divides and assigns the parties' property." Breslin v. Synnott, 2012 VT 57, ¶ 6, 192 Vt. 79, 54 A.3d 525. It then enters a Domestic Relations Order (DRO) "directing the [retirement] plan administrator to make certain specified payments to the ex-spouse." Id. (citations omitted). We have described a DRO as a "procedural device that enforces an underlying substantive order." Id. ¶ 7; see also 2 B. Turner, Equitable Distribution of Property § 6:20 (4th ed. 2019) (expressing similar sentiment).

¶ 3.     "The [retirement] plan administrator determines whether the order is qualified— whether a Q can be added to the DRO—subject to the right of either spouse to appeal the decision to a state or federal court." 2 Turner, supra, § 6:20. This results in a QDRO.[1] "A qualified order assures that a spouse receives benefits as an alternate payee." Ochoa v. Ochoa, 71 S.W.3d 593, 596 (Mo. 2002) (citing 29 U.S.C. § 1056(d)(3)(A), (J)).

¶ 4.     As Turner recognizes, "the requirements for qualification are difficult to meet." 2 Turner, supra, § 6:20; see also Larimore v. Larimore, 362 P.3d 843, 849 (Kan. Ct. App. 2015) (explaining that "valid QDRO must meet the comprehensive requirements of at least three federal acts, as amended: the Internal Revenue Code, [ERISA], and the Retirement Equity Act of 1984"

---

[1] For convenience and to avoid confusion, we refer to a DRO in some portions of this opinion as a "proposed QDRO," mindful that an order is not actually a QDRO until it is approved by a plan administrator.

(alteration in original) (quotation omitted). When a plan receives a proposed QDRO, the plan administrator must "promptly notify the participant and each alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders." 29 U.S.C. § 1056(d)(3)(G)(i)(I). "[W]ithin a reasonable period after receipt of such order," the plan administrator must "determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination." Id. § 1056(d)(3)(G)(i)(II).

¶ 5.     "If the administrator refuses to qualify the DRO, the court may amend it to address the source of the problem." 2 Turner, supra, § 6:20 (explaining that "[e]ssentially all jurisdictions" agree, with respect "to revision of DROs and other attempts to draft qualified orders dividing retirement benefits," that "[t]hose orders are subject to future changes without limitation, so long as the modification only enforces the court's previous substantive order, without modifying that order's substantive terms"). As indicated, "the modern rule is that the court may modify its DRO any number of times." Id. This modifiability is a strength of a DRO's "limited status . . . as [a] procedural device[] rather than [a] substantive order[]." Id. "[T]he weakness is that the DRO cannot reach a result inconsistent with the underlying substantive order." Id.

¶ 6.     "In short," Turner explains:

> when dividing retirement benefits, the law of equitable distribution is not playing on its home field. Because of ERISA, pension issues are litigated in material part upon the home field of the plan administrator. . . . Because the plan administrator is not required to play by normal state court rules, normal state court procedures must be adapted to the unique setting of DROs under ERISA.

Id.

¶ 7.     With this overview in mind, we turn to the facts. The parties here divorced in November 2004 after a twenty-five-year marriage. The court ordered an equal division of the marital assets. Both parties had pensions and various retirement accounts. As relevant here, the

court ordered wife to transfer $27,655 from one or both of her retirement accounts to husband within forty-five days of the date of the final divorce order.

¶ 8. No funds were transferred to husband within this period by QDRO or otherwise. In mid-2006, husband's attorney filed with the court a proposed QDRO, drafted by wife's attorney and edited by husband's attorney, to effectuate the transfer. The court approved the proposed QDRO in May 2006, identifying a particular retirement account from which a lump-sum payment should be made to husband as the "alternative payee." This order was then presumably sent to the plan administrator to determine if it should be qualified; if it was deemed qualified, the plan administrator would segregate the retirement funds and transfer them to husband's retirement account.

¶ 9. In September 2006, husband moved for enforcement of the divorce order and contempt. He asserted that there were no funds in the retirement account that wife identified in the proposed QDRO and, thus, there were no funds available to transfer to him. Wife's attorney acknowledged that wife had removed the funds from the retirement account she identified. She proposed a modified QDRO that identified a different retirement account.

¶ 10. The parties then engaged in a back-and-forth over the proposed QDRO's terms. Husband objected to the use of a QDRO at all, arguing that he was entitled to an immediate lump sum payment from wife. If a QDRO was warranted, husband argued that he was entitled to interest given wife's delay in transferring the funds to him. In late February 2007, at the parties' request, the court clarified that the final divorce order contemplated a transfer by QDRO from one retirement account to another. The following month, the court approved the second proposed QDRO drafted by wife's attorney; the order stated it was intended as a QDRO requiring wife to transfer the $27,655 from her retirement account to husband. The court denied husband's request to include accrued interest. The proposed QDRO, approved by the court, stated, among other things, that the court "shall retain jurisdiction with respect to this Order to the extent required to

4

maintain its qualified status and the original intent of the parties as provided herein." There is nothing in the record to show that a plan administrator ever approved this proposed QDRO.

¶ 11. Ten years later, in August 2017, husband filed a motion to enforce the final judgment of divorce. See generally V.R.F.P. 4.2 (describing process for filing post-judgment proceedings in divorce actions, including motions to enforce). He recounted the history of the two proposed QDROs. Husband averred that wife had forwarded the proposed QDRO to her plan administrator and that husband had assumed that the transfer occurred. He stated that he had recently learned that no retirement funds were transferred to him and that there were no funds available for transfer in the second retirement account that wife identified in the 2007 QDRO. Husband asked the court to compel wife to transfer the retirement funds to him with interest. Wife opposed the motion, arguing that husband's request was time-barred.

¶ 12. The court construed husband's motion as seeking enforcement of the November 2004 final divorce order and concluded that it was time-barred. The court determined that the eight-year limit for actions on judgments applied. See 12 V.S.A. § 506 ("Actions on judgments and actions for the renewal or revival of judgments shall be brought by filing a new and independent action on the judgment within eight years after the rendition of the judgment, and not after."). It found that unlike child-support orders, there was no specific statute shielding enforcement actions in divorce cases from the eight-year limit set forth in § 506. See 15 V.S.A. § 606(a), (c) (addressing enforcement of child-support orders).

¶ 13. The court also looked to a Nevada case applying similar statutes. It found compelling the Nevada Supreme Court's holding that a judgment-action limitations period applied to the enforcement of a divorce decree's property distribution, regardless of whether enforcement was brought "through motion practice or through an independent action." Davidson v. Davidson, 382 P.3d 880, 881, 884 n.2 (Nev. 2016) (stating that court did "not distinguish between a motion and an independent action to enforce a divorce decree because a party is not bound by the label he

5

puts on his papers," and that "[a] motion may be treated as an independent action or vice versa as is appropriate" (citation and brackets omitted)); but cf. Nelson v. Russo, 2008 VT 66, ¶ 6, 184 Vt. 550, 956 A.2d 1117 (mem.) holding, as now made clear in 12 V.S.A. § 506, that to be an "action" for renewal of judgment under § 506, party must file "new and independent suit commenced in accordance with [Vermont Rule of Civil Procedure] 3" and motion does not suffice).

¶ 14.    The Davidson court considered the timeliness of a wife's action to enforce a provision in a divorce decree requiring her ex-husband to pay her one-half of the equity in the marital home.  The court concluded that, "other than child support orders," Nevada law did not exclude family division orders from the state's six-year limitation for actions on judgments. Davidson, 382 P.3d at 883.  It reasoned that had the legislature "intended to vest the courts with continuing jurisdiction over property rights in divorce cases, it would have done so expressly." Id. at 884 (quotation and brackets omitted).  The court emphasized the need for finality and certainty and noted that the wife could have renewed her judgment and "avoid[ed] the harsh results that could accompany the expiration of a statute of limitations." Id.  It found its holding "consistent with several other states that apply limitations periods to enforcement of property distribution provisions in divorce decrees." Id. (citing cases).

¶ 15.    Finally, the court in this case cited Iannarone v. Limoggio, where we held that the doctrine of claim preclusion barred the wife from filing successive motions to enforce her ex-husband's obligation to pay her a certain sum under a final divorce order.  2011 VT 91, ¶ 23, 190 Vt. 272, 30 A.3d 655.  It noted that in Iannarone, we described the wife's second motion to enforce the terms of the final divorce order as beginning "a new or 'subsequent' case" for claim preclusion purposes and characterized the first motion to enforce as an "action." Id. ¶ 18.  The court here reasoned that analogous policy considerations encouraged a similar result in this case because claim preclusion and statutes of limitation both ensured timely finality of disputes.  It concluded that husband was trying to do by motion what would be barred by the statute of limitations for

6

actions on judgments. It found this inconsistent with <u>Iannarone</u>'s characterization of these types of motions as beginning new cases. The court thus found husband's motion to enforce barred by § 506. Husband appealed.[2]

¶ 16. Husband challenges the trial court's decision on multiple grounds. He first argues that the court erred in relying on claim preclusion to deny his request. He argues that claim preclusion is inapplicable here because he lacked a prior opportunity to litigate his claim. Husband further argues that § 506 should not apply because he filed a motion to enforce, not an "action on a judgment." He asserts that applying § 506 ignores the proposition, referred to favorably in our cases, that a trial court retains indefinite jurisdiction to enforce its own orders. Husband also contends that the Legislature and this Court have never expressly stated that § 506 governs motions to enforce a court's own order. Finally, husband cites various equitable principles and argues that wife should not be allowed to benefit from repeatedly disobeying a court order.

¶ 17. First, we find it unnecessary to address claim preclusion because it is inapplicable here and because the trial court did not rely on claim preclusion (other than by analogy) to deny husband's claim. We agree with husband, however, that this case is not like <u>Iannarone</u>, where one spouse could have, and should have, raised her current theory of recovery in a prior proceeding and failed to do so. Cf. 2011 VT 91, ¶ 13 (crediting husband's argument that "wife's 2005 enforcement action preclude[d] consideration of her 2008 enforcement action because the theory of the 2008 proceeding was available to her and recognized in 2006"); see also 3 B. Turner, <u>supra</u>,

---

[2] Wife moves to strike portions of husband's brief and printed case, including, apparently, husband's motion to enforce and the affidavit that accompanied his motion. These materials are plainly part of the trial court record and they are properly included in husband's printed case. See V.R.A.P. 10 (explaining that record on appeal includes, among other things, "the original documents . . . and exhibits filed . . . in the superior court"); V.R.A.P. 30(a)(1) (describing contents of printed case to include "relevant parts of the pleadings," and "other parts of the record to which the parties wish to direct the Court's attention"). Wife also asks this Court to strike portions of husband's arguments that she contends rely on "allegations outside the evidentiary record." The Court has not relied on any evidence outside the record in reaching its decision. We therefore deny wife's motion as moot.

7

§ 9:19 ("Principles of issue and claim preclusion clearly apply to enforcement of property division orders. Rulings on enforcement issues are binding if the same exact issue is raised by a later motion."). This is husband's first attempt to enforce the 2007 proposed QDRO, brought when he discovered that the transfer anticipated to occur pursuant to that order did not occur.

¶ 18. We note, moreover, that the statute of limitations for actions on judgments was not at issue in Iannarone, nor did we discuss QDROs and their unique role in transferring retirement funds. Instead, we considered if the trial court's denial of the wife's first motion to enforce payment of a certain sum reflecting her share of the value of the marital home constituted "a previous final judgment on the merits," one of the elements of claim preclusion. 2011 VT 91, ¶ 15. We concluded that the first denial was a final appealable judgment. We rejected the wife's argument that claim preclusion was inapplicable because her second motion should be considered a "subsequent case[] . . . in continuing litigation in the same action." Id. It was in this context that we stated that the wife's second motion to enforce "began a new or 'subsequent' case" and that "it was not a continuation of the action that [the] wife began when she filed her [first] motion to enforce" three years earlier. Id. ¶ 18. We do not find this language particularly helpful here.

¶ 19. We thus turn to husband's remaining arguments. We review de novo whether the statute of limitations set forth in § 506 bars husband's motion. See In re D.C., 2016 VT 72, ¶ 6, 202 Vt. 340, 149 A.3d 466 ("Questions of statutory interpretation are pure questions of law that we review de novo." (quotation and alteration omitted)). We need not decide in this case if, as a general matter, a motion to enforce constitutes an "action on a judgment" for purposes of § 506.[3]

---

[3] We note that we did not address this question in Breslin, 2012 VT 57, ¶ 10, although we cited out-of-state cases standing for the proposition that courts have "ancillary" or "indefinite" jurisdiction to enforce their orders. Cf. 3 B. Turner, supra, § 9:19 ("Property division orders are subject to the normal statute of limitations on enforcement of judgments generally."). In Breslin, a wife argued that the court was modifying a final divorce order by requiring her to sign a waiver to correct an existing QDRO and that it lacked jurisdiction to do so. We rejected the notion that the court was modifying the order, finding that the court's order was "necessary to enforce the correct terms of the divorce decree, and the court had jurisdiction to issue it." 2012 VT 57, ¶ 10.

We consider husband's motion as one that seeks to effectuate the final judgment through entry of an adjunct order and our decision turns on the unique nature of these procedural devices. We conclude that husband's request is not an "action on a judgment" under § 506 and that the court therefore erred in finding it time-barred.

¶ 20.    Other courts have reached similar conclusions under similar facts.  See Jordan v. Jordan, 147 S.W.3d 255, 262 (Tenn. Ct. App. 2004) (concluding that "the approval of [a] proposed QDRO is adjunct to the entry of the judgment of divorce and not an attempt to 'enforce' the judgment"); see also Joughin v. Joughin, 906 N.W.2d 829, 832-33 (Mich. Ct. App. 2017) (similarly concluding that "act to obtain entry of a proposed QDRO is a ministerial task done in conjunction with the divorce judgment itself" and it is "not an act to enforce a judgment or obligation").  The reasoning of these courts is persuasive.

¶ 21.    In Jordon, a wife was awarded a certain percentage of her husband's employment benefits in a final divorce order and the court directed the parties to prepare and submit a QDRO. More than ten years later, the wife did so.  Her former husband objected, arguing that entry of a QDRO was barred by the ten-year statute of limitations applicable to actions on judgments.  The trial court ultimately agreed with the husband.  It reasoned that the wife "could have tried to force an immediate transfer," and it found no statute that would "delay the finality" of final divorce decrees with respect to the division of assets.  Jordon, 147 S.W.3d at 258-59.  The court likened wife's submission of a proposed QDRO "to a request for an execution or garnishment" and observed that she had not tried to enforce the order through a contempt petition nor had she tried to execute upon the judgment for more than ten years.  The court also found that "the judgment expired because it was not renewed within ten . . . years."  Id. at 259.

¶ 22.    The appeals court reversed.  It noted the dearth of case law on the "core question" before it of "whether an attempt to secure the approval of and entry of a QDRO is 'an action on a judgment' within the contemplation of" the ten-year statute of limitations for actions on judgments.

9

Id. (alterations omitted). After reviewing ERISA and existing authority, the court concluded that the wife's attempt to secure entry of a QDRO was not barred. Id. It rejected the notion "that the submission of a proposed QDRO was akin 'to a request for an execution or garnishment.' " Id.

¶ 23. The court recognized the difficulties inherent in drafting a DRO that would be qualified and noted the absence of a statute of limitations for entry of a QDRO under ERISA. Id. at 260 ("Under ERISA, there is no statute of limitations for the entry of a QDRO."); see also 29 C.F.R. § 2530.206(c)(1) (explaining that DRO that meets qualification requirements "shall not fail to be treated as a qualified domestic relations order solely because of the time at which it is issued"). It emphasized that until a plan administrator approved a proposed QDRO, the wife's right to receive benefits under her husband's plan—created by the final divorce order and recognized by the proposed QDRO—was unenforceable under ERISA. Jordan, 147 S.W.3d at 261-62 ("[B]efore the plan administrator finds and reports that the domestic relations order is qualified, the division [of funds] decreed by the court cannot be enforced—regardless of what the court, the parties, or one of the parties, does or attempts to do—without resort to the provisions of ERISA."). The wife could not, for example, simply send a certified copy of the final divorce order to her husband's employer and successfully demand payment of her share of the husband's benefits. Id. "ERISA and the other pertinent statutes stand in the way of enforcement until the plan administrator acts favorably upon the proposed QDRO submitted to it." Id. at 262.

¶ 24. Because the plan administrator had not yet approved the proposed QDRO, "the trial court's decree [could not] be enforced against the 'holder of the purse strings,' " and "[a]ny attempt to 'enforce' the trial court's validly entered division of [h]usband's pension plan would be futile." Id. Based on its analysis, the court concluded that "the approval of the proposed QDRO [was] adjunct to the entry of the judgment of divorce and not an attempt to 'enforce' the judgment." Id. It thus was not barred by the statute of limitations. Id. at 263.

¶ 25. The Michigan Court of Appeals reached a similar conclusion in Joughin, 906 N.W.2d at 832. In that case, a wife submitted a proposed QDRO approximately twelve years after a divorce judgment, seeking to obtain her interest in her former husband's profit-sharing annuity plan. The husband objected, arguing that the filing was an attempt to enforce the final divorce order and that it was barred by the ten-year statute of limitations for actions to enforce noncontractual money obligations founded upon court judgments. The trial court entered the QDRO and the appeals court upheld its decision.

¶ 26. The appeals court considered a QDRO "as part of the divorce judgment," and thus, it could not "be viewed as enforcing that same judgment." Id. (quotation omitted). The court cited Jordan and agreed with its conclusion that " 'the approval of the proposed QDRO is adjunct to the entry of the judgment of divorce and not an attempt to 'enforce' the judgment.'" Id. (quoting Jordan, 147 S.W.3d at 262).

¶ 27. As in Jordan, the court emphasized that entry of a proposed QDRO "did not compel the payment of any money to plaintiff," which further demonstrated that it was "not equivalent to the enforcement of a noncontractual money obligation." Id. (reiterating that proposed QDRO would not be "enforceable until the plan administrator determines that the proposed QDRO is 'qualified' under ERISA"). It reasoned that compliance with the divorce court's instructions on securing a QDRO was merely compliance with "ministerial obligations under the judgment— nothing more, noting less." Id. at 833. "Though such actions ultimately will have the effect of allowing one party to share in the retirement benefits of the other," the court explained, "this procedure is not an enforcement of a money judgment in the sense covered by the statute." Id.[4]

---

[4] Some states have enacted laws explicitly providing courts with continuing jurisdiction to establish, maintain, or revise DROs to ensure that they are qualified, or stating that divisions of retirement benefits are not final until a DRO is qualified by the plan administrator. See 2 B. Turner, supra, § 6:20 (citing statutes and cases applying such statutes).

¶ 28. We reach a similar conclusion here. As discussed at the outset of this opinion, the trial court's division of the parties' assets and its approval of a DRO is only the first step in obtaining the transfer of retirement funds under ERISA; a spouse has no right to payment from a particular retirement account until a plan administrator determines that a QDRO has been created, that is, the court's DRO is qualified. Thus, although husband was awarded the right to a particular amount of retirement funds in the 2004 divorce order, he had no effective ability to enforce that portion of the order through an "action on the judgment." See Koerber v. Middlesex Coll., 136 Vt. 4, 7, 383 A.2d 1054, 1056 (1978) (explaining that "[w]here a plaintiff has obtained a valid and final money judgment against a defendant, a debt for the amount so awarded is created," and "judgment creditor not only can maintain execution proceedings for the enforcement of the judgment, but also can maintain an action upon the judgment"); see also Jordon, 147 S.W.3d at 263 (concluding that "[u]ntil the proposed QDRO is approved by the plan administrator and entered by the trial court, the act of the trial court in dividing the pension plan is not complete and hence not enforceable," and describing division as "inchoate in nature"). "Enforcement" under these circumstances would be a futile act.[5]

¶ 29. We agree with the courts above that "the approval of [a] proposed QDRO is adjunct to the entry of the judgment of divorce and not an attempt to 'enforce' the judgment." Joughin, 906 N.W.2d at 832 (quoting Jordan, 147 S.W.3d at 262). In reaching our conclusion, we are also mindful of the modern rule that "the court may modify its DRO any number of times," 2 B. Turner,

---

[5] We note the availability of contempt proceedings under 15 V.S.A. § 603(b). Under § 603(b), "[i]f a person disobeys a lawful order of the Family Division made under the provisions of this chapter and the order creates a financial obligation, including payment of child support, spousal maintenance, or a lump sum property settlement, the person may be subject to proceedings for civil contempt as provided by 12 V.S.A. § 122 and the provisions set forth herein." See also V.R.F.P. 16 (addressing civil contempt proceedings in family division cases). The availability of contempt proceedings, however, does not show that husband had the ability to take an "action on the judgment" under § 506, which requires the "filing of a new and independent action on the judgment."

supra, § 6:20, and that the court here expressly reserved jurisdiction to modify the DRO "to the extent required to maintain its qualified status and the original intent of the parties as provided herein." We conclude that husband is entitled to seek modification of the DRO here.

¶ 30. We acknowledge that other courts have reached conclusions different from those set forth above, albeit in a slightly different context. See Larimore, 362 P.3d at 850-51 (concluding that division of retirement accounts in divorce decree was judgment subject to dormancy, and judgment became dormant and was extinguished under Kansas law due to passage of time); In re Marriage of Porterfield, No. 118,479, 2019 WL 847671, at *9 (Kan. Ct. App. Feb. 22, 2019) (unpub. mem.) (reviewing holdings in out-of-state cases, including Jordan and Joughin, but adhering to Larimore as it followed plain language of Kansas dormancy and revivor statutes)[6]; see also Joughin, 906 N.W.2d at 834-39 (Jansen, J., dissenting) (arguing that entry of QDRO "is an action to enforce a judgment of divorce and subject to the applicable statute of limitations," and that "claim" accrues when spouse "became entitled to initiate proceedings to secure her [or his] right to enter a QDRO," and agreeing with Larimore, 362 P.3d at 843, that "while federal law [does] not provide a statute of limitations for the filing of a QDRO, the plaintiff could only obtain a QDRO if she had a valid right or interest created under Kansas domestic relations law to enforce" (alteration omitted)); 2 Turner, supra, § 6:20 (stating, without elaboration, that because "a DRO is

_____

[6] We note that the Larimore court construed a dormancy statute, the application of which was not limited to money judgments, rather than a statute of limitations for actions on judgments. See 362 P.3d at 850-51 (noting that, under Kansas law, dormant judgments may be revived "by a combination of (1) a motion for revivor, coupled with (2) a request for the immediate issuance of an execution, garnishment or attachment" and noting that "[i]n this regard, dormancy and revivor statutes are different than statutes of limitation and they demand strict compliance" (citation omitted)). It held that "court-ordered transfers of retirement benefits are amenable to execution and, thus, they are not exempt from the dormancy statute." Id. at 851. The court reasoned that the wife "was required to execute upon the judgment by filing a QDRO in order to enforce her right to receive benefits under [her husband's] retirement accounts." Id. Because she waited "until after the district court's judgment dividing the parties' retirement benefits was extinguished by the dormancy statute before attempting to procure a QDRO," however, the court concluded that the wife was left "without a judgment to enforce." Id. at 852.

13

generally viewed as an enforcement device, the better option [is] to hold that a motion for entry of a DRO is governed by the state's normal statute of limitations on enforcing judgments").[7] We simply disagree with the conclusion that entry of a DRO is an attempt to enforce the underlying final divorce order or that the filing of a DRO constitutes an execution upon the judgment. As previously discussed, the right to obtain the retirement funds awarded in a final divorce order depends upon the approval of a third-party, the plan administrator. There is no "judgment" to execute or enforce until that step has been taken.

¶ 31.  Thus, for the reasons stated above, we reverse the trial court's decision and remand for entry of a revised DRO. We do not decide at this juncture if the revised DRO should include interest. We note, however, that "[s]ome courts are starting to award interest on QDROs and similar orders transferring retirement benefits." 2 Turner, supra, § 6:20 (citing cases). We leave it to the trial court to decide this question in the first instance on remand.

<u>Reversed and remanded for additional proceedings consistent with this opinion</u>.

FOR THE COURT:

_____

Associate Justice

---

[7] We note that <u>Davidson</u>, cited by the trial court, does not involve entry or modification of a QDRO and the cases cited by the <u>Davidson</u> court similarly do not involve QDROs. See <u>Davidson</u>, 362 P.3d at 884 n.3. We thus do not rely on this case here.

14